**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

RTC INDUSTRIES, INC.,           )
                                )
            Plaintiff,          )
                                )
        v.                      )      No. 06 C 5734
                                )
MICHAEL HADDON,                 )
                                )
            Defendant.          )

**MEMORANDUM OPINION**

Before the court is Defendant's motion for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons explained below, the court denies Defendant's motion.

**BACKGROUND**

Haddon worked for RTC Industries, Inc. ("RTC"), a company which provides in-store merchandising services, from January 14, 1991 through May 10, 2006. (Compl. ¶¶ 1-2.) When he left the company in 2006, Haddon was RTC's Vice President of Customer Business Development. (Id.) In that position, he was exposed to and utilized confidential information concerning RTC's current business as well as its future business strategy. (Id. at ¶¶ 2, 8.) On March 21, 2006, Haddon executed an Agreement on Confidential Information and Non-Competition (the "Agreement").

(<u>Id.</u> at ¶ 3.)   Among other post-employment restrictions, the Agreement contains the following non-compete covenant:

> Associate agrees that Associate alone or as a partner, joint venturer, officer, director, member, employee, consultant, agent, representative, independent contractor, advisor, stockholder or in any other capacity of any company, person or busines, shall not:
>
> [ . . . ]
>
> (c) for 2 years following the termination of Associate's employment with RTC for any reason, directly or indirectly, provide services to any person or entity that engages in any business that makes or sells Products or Services if doing so would involve the actual or threatened unauthorized use or disclosure of Confidential Information or Confidential Documents.

(Agreement at Sections II & III, attached as Ex. A to the Compl.) "Products" and "Services" mean "the goods and services sold or provided by RTC at any time during Associate's employment with RTC." <u>Id.</u> at Section III(a).[1]  The Agreement also contains a separate non-disclosure clause that prohibits Haddon from disclosing or using Confidential Information.

At some unspecified point during Haddon's employment with RTC, he began discussions with DCI Marketing, Inc. ("DCI"), RTC's

---

[1] "Confidential Information" means "all information, whether written or oral, tangible or intangible, of a private, secret, proprietary or confidential nature, of or concerning RTC (including any of its related or affiliated entities) and its business operations, or any of its customers, prospective customers and suppliers . . . ." <u>See</u> Agreement at Section II(b).  The definition then sets forth a non-exhaustive list of items constituting Confidential Information including, for example, the identity and background of RTC customers. "Confidential Documents" include all "tangible materials containing Confidential Information." <u>Id.</u> at Section II(c).

competitor. These discussions culminated in Haddon's decision to leave RTC to join DCI. (Compl. ¶ 9.) RTC alleges that Haddon was hired by DCI with the "understanding" that he would have the opportunity to become DCI's president. (Id. at ¶ 10.)

On or about April 18, 2006, while still employed by RTC, Haddon attended a meeting at RTC at which he learned "confidential information" that a DCI employee, Dean Schipke, had accepted an employment offer from RTC.[2] (Id. at ¶ 11.) Immediately after the meeting, Haddon notified DCI of this fact. (Id. at ¶ 11.) This was news to DCI, as Schipke had not yet notified DCI that he had accepted RTC's offer. (Id. at ¶ 12.)[3] Schipke subsequently rescinded his acceptance of RTC's offer. (Id. at ¶ 13.) RTC alleges that Haddon caused Schipke to rescind by disclosing to DCI that Schipke had accepted RTC's offer, although Schipke's precise reasons for rescinding are unclear. (Id. at ¶ 15.) At some point after informing DCI about Schipke's imminent departure, RTC confronted Haddon. (Id. at ¶ 19.) According to RTC, Haddon made "false, shifting and inconsistent" statements concerning whether he had spoken to DCI at all about Schipke, or had only confirmed that Schipke was joining RTC after DCI told him that this was indeed the case. (Id.)

---

[2] It is unclear whether Haddon had committed to join DCI at this time.

[3] RTC does not indicate whether DCI was aware of discussions between Schipke and RTC, or if it knew that RTC had extended an offer.

One week after the Schipke incident, Haddon announced to RTC that he was going to join DCI. (<u>Id.</u> at ¶ 17.) RTC then told Haddon not to return to RTC in order to terminate his access to RTC's confidential information. (Id. at ¶ 18.)[4] RTC further alleges that it would have asked Haddon to leave earlier had it known about his discussions with DCI. (<u>Id.</u> at ¶¶ 16, 18.) In connection with his departure, RTC asked Haddon to turn over his "daily planners," which contain customer contact information and meeting notes, among other things. (<u>Id.</u> at ¶ 20.) Haddon turned over his planners for 2006 (with two pages missing) and December 2005, only. (<u>Id.</u>) He told RTC that he had thrown out nine years of planners in January 2006. (<u>Id.</u>)

RTC asserts three claims against Haddon. First, RTC claims that Haddon breached his fiduciary duty to RTC when he disclosed to DCI Schipke's intention to join RTC. (<u>Id.</u> at ¶ 24.) Second, RTC claims that Haddon breached the Agreement by (i) again, disclosing that Schipke had accepted an offer from RTC; and (ii) working for an RTC competitor in a capacity that will entail the actual or threatened unauthorized use or disclosure of RTC's Confidential Information. (<u>Id.</u> at ¶ 30.) Third, RTC asks the court to enjoin Haddon from divulging RTC's trade secrets pursuant to Section 3 of the Illinois Trade Secrets Act (the "ITSA"). (<u>Id.</u> at ¶¶ 42-43.)

---

[4] Nevertheless, Haddon remained employed by RTC for approximately two more weeks. (<u>Id.</u> at ¶ 2.)

## DISCUSSION

**A.   Legal Standard**

A defendant may file a motion under Rule 12(c) after the close of the pleadings to raise various Rule 12(b) defenses regarding procedural defects.  <u>Alexander v. City of Chicago</u>, 994 F.2d 333, 336 (7th Cir. 1993).  The court will review such a motion under the same standard as a motion to dismiss pursuant to Rule 12(b).  <u>Frey v. Bank One</u>, 91 F.3d 45, 46 (7th Cir. 1996); <u>GATX Leasing Corp. v. National Union Fire Ins. Co.</u>, 64 F.3d 1112, 1114 (7th Cir. 1995).  As a result, the court will deny the defendant's motion if the complaint (i) "describes the claim in sufficient detail to give the defendant fair notice of what the ... claim is and the grounds upon which it rests;" and (ii) "plausibly suggest[s] that the plaintiff has a right to relief, raising that possibility above a speculative level."  <u>E.E.O.C. v. Concentra Health Serv., Inc.</u>, --- F.3d ---, 2007 WL 2215764, *2 (7th Cir. Aug. 3, 2007) (internal citation and quotation marks omitted).  In evaluating the motion, the court will view the facts in the complaint in the light most favorable to the nonmoving party.  <u>Craigs, Inc. v. General Elec. Capital Corp.</u>, 12 F.3d 686, 688 (7th Cir. 1993).

**B.   ITSA Preemption**

Haddon contends that the ITSA preempts RTC's fiduciary-duty claim.[5] The ITSA "abolishes claims other than those based on contract arising from misappropriated trade secrets." Hecny Transportation, Inc. v. Chu, 430 F.3d 402, 404 (7th Cir. 2005); see also ITSA, 765 ILCA 1065/8(a)(The ITSA is "intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret."). In Hency, Hency alleged that George Chu, its employee, "divert[ed] its assets (its physical plant, its employees' time, and its information such as customer lists) to competing businesses, which Chu allowed to operate from Hency's premises." Id. at 403-04. Hency claimed that the customer lists were trade secrets. Id. at 404. The district court disagreed, a point on which it was affirmed on appeal. Id. But the district court went on to rule that the ITSA preempted Hency's other claims: diversion of corporate opportunities, "fiduciary defalcations" and "outright theft." Id. The Seventh Circuit reversed the district court's order dismissing those claims, concluding that "[t]rade secrets have nothing to do with Hency's principal claims." Id.

---

[5] The parties assume that the information concerning RTC's offer to Schipke is covered by the ITSA. The statute covers "information" that is "sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use [and] is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2. So, the parties' assumption seems correct.

Indeed, Hency's other claims were so far afield of trade secrets that it is unclear how broadly to apply the Seventh Circuit's decision. RTC argues that, after <u>Hency</u>, fiduciary-duty claims are never preempted. (RTC Resp. at 7.) This interpretation is arguably supported by the Seventh Circuit's quotation from the Uniform Law Commissioners' comment to the model act:

> The [provision] does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information, *like an agent's duty of loyalty to his or her principal.*

<u>Id.</u> at 405 (emphasis added). RTC argues that its claim cannot be preempted because the duty of loyalty is based on the employee's relationship to his employer, and not on "competitively significant secret information." (RTC Resp. at 7.) Elsewhere in the opinion, however, the Court suggests that fiduciary-duty claims may be preempted in limited circumstances. Surveying other state court decisions interpreting similar provisions based on the Uniform Trade Secrets Act of 1985, the Court noted that the "dominant view is that claims are foreclosed only when they rest on *the conduct* that is said to misappropriate trade secrets." <u>Id.</u> at 404–405 (emphasis added). Accordingly, there are still some instances where the ITSA will preempt a fiduciary-duty claim.

Haddon, relying exclusively on pre-<u>Hency</u> cases, argues that a fiduciary-duty claim is preempted unless the underlying conduct has "nothing to do with" trade secrets. In other words, RTC

effectively pleaded itself out of court by alleging that Schipke's imminent departure was confidential. See, e.g., Learning Curve Toys, L.P. v. Playwood Toys, Inc., No. 94 C 6884, 1999 WL 529572, *3 (N.D. Ill. July 20, 1999) ("[I]f the operative facts are arguably cognizable under the ITSA, any common law claim that might have been available on those facts in the past now no longer exists in Illinois."). We conclude that Hency departs from the broad preemptive effect applied in these prior cases. See, e.g., Dominion Nutrition, Inc. v. Cesca, No. 04 C 4902, 2006 WL 560580, *4 (N.D.Ill. March 2, 2006) (noting that Hency "narrowly construed" the ITSA's preemptive effect). After Hency, the test for a non-ITSA claim is not whether the plaintiff arguably could have brought an ITSA claim. Rather, the test is whether the plaintiff's claim would lie if the information at issue were non-confidential. See Hency, 430 F.3d at 405 ("An assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record.").

Here, RTC alleges that Haddon, while still employed by RTC, provided information to DCI in an attempt to curry favor with his future employer and to prevent DCI's loss of Schipke's valuable services. Even if RTC had not taken any steps to ensure that Schipke's hire remained confidential, RTC's claim would be sound. See, e.g., Hill v. Names & Addresses, Inc., 571 N.E.2d 1085, 1091

(Ill. App. Ct. 1991) (concluding that the confidentiality of information shared with a competitor is not relevant to a claim for breach of the duty of loyalty).  Moreover, contrary to Haddon's assertions, RTC's ITSA claim is not based on Haddon's disclosure of the Schipke offer to DCI.  <u>Cf.</u>, <u>Composite Marine Propellers, Inc. v. Van der Woude</u>, 962 F.2d 1263, 1265 (7th Cir. 1992) (noting in dicta that the ITSA would preclude plaintiff's fiduciary-duty claim if that claim were predicated on the misappropriation of trade secrets).  That claim is instead predicated on the allegation that Haddon will "inevitably" disclose RTC's trade secrets in his new job at DCI.  <u>Cf.</u>, <u>Hency</u>, 430 F.3d at 404-405 ("The dominant view is that claims are foreclosed only when they rest *on the conduct that is said to misappropriate trade secrets*.") (emphasis added).  Applying <u>Hency</u>, RTC's fiduciary-duty claim is not preempted.

**C.** **<u>Non-Compete Covenant</u>**

Haddon argues that the Agreement's non-compete provision is overbroad and unenforceable as a matter of law.  Illinois courts closely scrutinize non-compete covenants in light of the public's interest in a competitive marketplace.  <u>Callahan v. L.G. Balfour</u>, 534 N.E.2d 565, 569 (Ill. App. Ct. 1989).  An Illinois court will enforce a non-compete covenant only if it is "reasonable in geographic and temporal scope and it is necessary to protect a legitimate business interest of the employer."  <u>Abel v. Fox</u>, 654

N.E.2d 591, 593 (Ill. App. Ct. 1993).[6]  A blanket prohibition on competition, without any geographical or temporal limitation, is unreasonable as a matter of law.  Roberge v. Qualitek Int'l, Inc., Case No. 1 C 5509, 2002 U.S. Dist. LEXIS 1217, *12 (N.D. Ill. Jan. 25, 2002) (applying Illinois law).  However, a geographical limitation is not necessary if the restrictive covenant only prohibits the employee from engaging in certain activities, such as soliciting his or her former employer's customers.  Eichman v. Nat'l Hosp. and Health Care Services, Inc., 719 N.E.2d 1141, 1147 (Ill. App. Ct. 1999).  Haddon contends that the Agreement's non-compete covenant is a blanket prohibition on competition, citing Roberge.  The non-compete covenant in Roberge provided that the employee "will not either directly or indirectly . . . engage in competition with [Qualitek] for a period of two years."  Roberge, 2002 U.S. Dist. LEXIS 1217, at *15.  Like the non-compete covenant in Roberge, Section III(c) is not limited geographically.  By its terms, RTC could enforce the provision to prevent Haddon from taking a position anywhere in the world.  But contrary to Haddon's assertions, it is an "activity restriction."  Section III(c) restricts Haddon only insofar as providing services to a competitor "would involve the actual or threatened unauthorized use" of RTC's

---

[6]  The covenant must also be "ancillary to a valid contract" and be supported by "adequate consideration".  Abel, 654 N.E.2d at 593.  Haddon has not challenged the Agreement's non-compete provision on either ground.  (Mot. to Dismiss at 7 n.7.)

confidential information. Accordingly, <u>Roberge</u> and other cases dealing with "blanket" prohibitions are distinguishable.

Haddon insists that actual or threatened disclosure of confidential information is not a proper "activity restraint." First, he points out that the non-compete covenant in this case does not fall within the traditional activity-restraint categories, such as non-solicitation agreements. <u>Cf.</u>, <u>McRand, Inc. v. Van Beelen</u>, 486 N.E.2d 1306, 1309-10 (Ill. App. Ct. 1985). However, the ultimate test is whether the restriction is "necessary to protect a legitimate business interest of the employer." <u>Abel</u>, 654 N.E.2d at 593. This analysis is not susceptible to *per se* rulemaking, <u>Lawter Int'l, Inc. v. Carroll</u>, 451 N.E.2d 1338, 1345 (Ill. App. Ct. 1983), and instead "depends on the particular facts of each case." <u>Donald McElroy, Inc. v. Delaney</u>, 389 N.E.2d 1300, 1307 (Ill. App. Ct. 1979). One of the factors that the court may consider is whether "there are special circumstances, such as customer lists, customer contacts, trade secrets or other confidential information to be protected." <u>Lawter</u>, 451 N.E.2d at 1345 (concluding that a covenant not to compete was enforceable despite lacking any geographical limitation). RTC has a legitimate interest in protecting its confidential information. <u>Lawter</u>, 451 N.E.2d at 727-728. The question is whether the non-compete provision is nevertheless overbroad in relation to that interest. <u>Id.</u>

Haddon's second, more substantive objection is that the clause conflates the more permissive guidelines with respect to confidentiality agreements and the restrictive guidelines governing non-compete covenants. In contrast to non-compete covenants, confidentiality agreements are not invalid solely because they lack any geographical or durational limitation. See ITSA, 765 ILCS 1065/8. Although not cited by either party in connection with this motion, we believe that the Seventh Circuit's decision in Pepsico, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995) is instructive. The defendant in Pepsico, William Redmond, held a "relatively high-level position" at PepsiCo that "gave him access to inside information and trade secrets." Pepsico, 54 F.3d at 1264. To protect that information, PepsiCo required Redmond to execute a confidentiality agreement prohibiting him from disclosing Pepsico's confidential information "at any time." Id. When Redmond left PepsiCo to work for Quaker Oats Company, a Pepsico competitor, PepsiCo sued to enjoin Redmond from divulging PepsiCo's confidential information and "from assuming any duties with Quaker relating to beverage pricing, marketing, and distribution." Id. at 1263. PepsiCo argued that knowing PepsiCo's confidential information would "necessarily influence his decisions" as a Quaker executive. Id. at 1267. The district court granted the injunction, and the Seventh Circuit affirmed. The Seventh Circuit concluded that a "plaintiff may prove a claim of trade secret

misappropriation by demonstrating defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." Id. Applying the same rationale, the court concluded that PepsiCo had demonstrated a likelihood of success on the merits with respect to its breach-of-contract claim based upon its showing that Redmond would inevitably breach the confidentiality agreement in his new position at Quaker. Id. at 1271-72.

The non-compete covenant in this case is similar to the *de facto* non-compete covenant in PepsiCo. See Bayer Corp. v. Roche Molecular Sys., Inc., 72 F.Supp. 2d 1111, 1120 (N.D. Cal. 1999) (applying California law and noting that the inevitable disclosure doctrine creates a *de facto* non-compete clause). The difference is that in this case Haddon expressly agreed to be bound by the non-compete, whereas in PepsiCo Redmond might well have been surprised to learn that his confidentiality obligations could prevent him from accepting a position with a PespsiCo competitor. Haddon insists that it would be improper to use a non-compete agreement to protect confidential information, yet this is exactly what PepsiCo permits. It would be a strange result if, as a matter of law, contracting parties could not do directly what the Illinois law permits them to do indirectly.

Service Centers of Chicago, Inc. v. Minoque, 535 N.E.2d 1132 (Ill. App. Ct. 1989), which Haddon cites, is not to the contrary. In Service Centers, the plaintiff sought to enforce an agreement

prohibiting its former employee from using the plaintiff's confidential information. The agreement defined "confidential information" as "essentially all the information provided by Deliverex to Minogue 'concerning or in any way relating to the services offered by Deliverx.'" Id. at 1137. The court concluded that this definition was overbroad and amounted to a "covenant not to compete which is completely unrestricted in duration or geographical scope." Id. Defining "confidential information" so that it encompasses all information related to the employer's business, whether or not it is in fact confidential or proprietary, is necessarily overbroad. The definition of confidentiality in the Agreement, by contrast, is appropriately limited to information of "a private, secret, proprietary or confidential nature." Moreover, the covenant not to compete requires the "actual or threatened" use or disclosure of RTC's confidential information. Whether RTC can satisfy its burden to show that Haddon materially breached this provision remains to be seen. However, the court concludes that it is not broader than necessary to protect RTC's legitimate interest in its confidential information.

## CONCLUSION

Defendant's 12(c) Motion for Partial Judgment on the Pleadings (23) is denied. A status hearing is set for September 19, 2007 at 10:30 a.m.

DATE:     September 10, 2007

ENTER:    _____

John F. Grady, United States District Judge